# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| SUSAN BALLOU,<br>individually and on behalf of all others<br>similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>BMW OF NORTH AMERICA, LLC and<br>BAYERISCHE MOTOREN WERKE<br>AKTIENGESELLSCHAFT<br><br>    Defendants. | Civil Action No. 18-cv- 11765<br><br>**CLASS ACTION COMPLAINT<br>AND JURY TRIAL DEMAND** |

Plaintiff, SUSAN BALLOU (hereinafter "Ballou," "plaintiff" or "proposed class representative"), through her counsel, on behalf of herself and all other individuals and entities similarly situated as more fully described *infra*, initiate this proposed class action and allege as follows:

1. The defendants in this action designed and manufactured certain MINI Cooper[1] passenger motor vehicles, model years 2011 through (and including) 2015, equipped with the N16 and N18 engine (hereinafter collectively "class vehicles" or "class vehicle"). Class vehicles are equipped with four cylinder multi-valve in-line engines including but not limited to engine codes N16 and N18 (hereinafter "class engines" or "class engine").[2] The proposed class representative and members of the proposed class request injunctive relief, monetary damages, including multiple damages where applicable, court costs and attorney fees against each of the respective BMW entities based upon their breach of express warranty, breach of implied

---

[1] MINI is a marque of the BMW defendants.
[2] Class vehicles include but are not limited to Mini Cooper R55, R56, R57, R58 and R59 models utilizing the N16 or N18 engine sold and/or leased in the United States. Both engines are substantially similar with the primary difference being the use of a turbocharger in the N18.

warranty, misrepresentation, unfair and deceptive business practices, unjust enrichment and violation of consumer protection laws of New Jersey and Florida (jointly referred to as "state consumer protection laws").

2.    Class engines are predisposed to premature primary chain assembly failures.[3]   The chain assembly is comprised of internal engine components.  The primary chain (a/k/a the timing chain) assembly connects and synchronizes the engine's camshafts and crankshaft, which in turn controls the opening and closing of the valves in the engine's combustion chambers.  The primary chain assembly ensures the engine operation occurs in the precise, synchronized manner necessary for the engine to properly function.  A primary chain assembly partial or complete failure allows the chain to skip teeth on the chain sprockets.  This occurrence causes the camshafts and crankshaft to fall out of synchronization and lose power or cause the engine's pistons and valves to violently collide into one another.

3.    Depending on the degree of camshaft and crankshaft misalignment, the engine will operate poorly, resulting in stalling and a limited ability to accelerate or maintain vehicle speed. Primary chain assembly failures can also cause sudden and catastrophic engine self-destruction as the valves impact the cylinder pistons where the chain skips multiple teeth of the sprockets in one occurrence or the chain separates.

4.    The primary chain in class engines is constructed of a defective material and prematurely fails either by chain separation or allowing sufficient elongation to cause chain skip on engine drive sprockets (crankshaft and camshaft) sufficient to cause severe engine damage or complete engine destruction.  These scenarios pose a serious safety issue while the vehicle is

---

[3]  The primary chain assembly is comprised *inter alia* of camshaft and crankshaft sprockets, primary (timing) chain, hydraulic chain tensioner, tensioning arm and chain guide. The primary chain assembly is depicted in Figure 1, *infra.*

being operated since there is loss of engine power without warning and reduced braking caused by lack of engine vacuum.  In class vehicles equipped with manual transmissions, the drive wheels will lock and cause loss of directional stability and steering.  In other instances, the engine may fail to start, leaving the driver and passenger stranded mid-journey.



**FIGURE 1: CLASS ENGINE PRIMARY CHAIN ASSEMBLY[4]**

5.  Class vehicles are defective with respect to the primary chain assembly that subjects class engines to premature catastrophic engine failure.  Class vehicles are further defective since the vehicles were accompanied by an Owner's Manual and Service and Warranty Information pamphlet that did not incorporate primary chain assembly inspections, maintenance and/or service intervals that were in fact necessary given the assembly's propensity for premature

_____

[4] View from front of engine block looking forward.

3

failure.[5]    These class engine premature timing chain failures are in direct contradiction to BMW's widely disseminated assertion that: "The timing chain driving the camshafts [in class engines] is not only very precise and reliable, but also remains maintenance-free throughout the full running life of the engine." *Media Information, Petrol Engines in the BMW Group/PSA Peugeot Citroen Cooperation* publication dated 12/2004 at p. 15 attached as Exhibit A.[6]

6. The primary chain assembly is reasonably expected by Bayerische Motoren Werke Aktiengesellschaft (hereinafter "BMW AG") and BMW of North America, LLC (hereinafter "BMW LLC") (hereinafter collectively referred to as "defendants"), the proposed class representative and proposed class members to last the serviceable life of the vehicle that is in excess of 150,000 miles.[7]    The primary chain assemblies in class vehicles often fail at less than 50% of their reasonably expected useful life.    For example, proposed class representative Ballou's class vehicle experienced a primary chain assembly failure at 46,062 miles.

---

[5] A substantial contributing cause of premature engine chain assembly failures are 15,000 mile / 24 month Condition Based Service engine oil change intervals.    In approximately mid 2012, the new basic engine oil change interval was changed to 10,000 miles / 12 months in an attempt to limit premature failure of internal engine components including the primary chain. However, this oil change interval is also excessive in duration and causes premature component failure.

[6] The Prince engine is a codename for the joint development of 1.4-1.6 liter passenger automobile engines developed by BMW and PSA Peugeot Citroen.    BMW variants of this cooperation include the N16 and N18 class engines.

[7] Service and Warranty Information materials for class vehicles have class engine maintenance and parts replacement schedules that extend to 150,000 miles.    There is no scheduled maintenance or replacement recommended for class engine primary chains during the entirety of this mileage duration or any time period.    Service and Warranty Information materials for class vehicles recite the following with respect to vehicle maintenance:

The BMW Maintenance Program is a benefit designed to help reduce the cost of ownership.    This program has been devised with the following objectives: to maximize vehicle safety, reliability, and resale value by minimizing breakdowns resulting from wear, and minimizing cost and inconvenience by computing maintenance intervals based upon the specific manner in which each individual vehicle is driven.

7.    Moreover, after experiencing a failure of the chain assembly, some class engines are not repairable and require complete engine replacement.  Class engine failures cost class vehicle owners between $3,000.00 (to replace chain assembly where there is no engine damage) and $15,000.00 (for a new replacement engine).  Individuals who own or have owned class vehicles also sustained diminution of the resale value of their class vehicles since knowledge of problems with class engines became public information.

8.    Purchasers of class vehicles were exposed to the defendants' false statements concerning low operating costs / no maintenance (including that major engine components such as the timing chain required no maintenance) and the adequacy of Condition Based Service.

**Jurisdictional and Venue Statement**

9.    Federal jurisdiction exists by virtue of the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332(d), 1453 and 1711–1715 since there are in excess of 50,000 class members and the named proposed class representative and proposed class members' aggregate damages exceed $5,000,000.00, exclusive of interest and costs.   Minimal diversity exists between the parties with residency in different states.  The jurisdictional requirements of the state Magnuson–Moss Act claims alleged herein as set out in 15 U.S.C. § 2310(d)(1)(A) are satisfied by CAFA diversity jurisdiction with respect to such state law claims.

10.    The defendants are persons under this jurisdiction's long-arm statute.  In the United States, BMW LLC acts as the alter ego and/or agent of BMW AG as well as the warrantor with respect to the class vehicles.  *In personam* jurisdiction exists over the defendants under this jurisdiction's so-called "long arm statute."  BMW LLC maintains its corporate headquarters in New Jersey and the defendants directly and through their agents regularly transact business and otherwise derive substantial revenue in this jurisdiction and throughout the entire United States.

The defendants also conduct continuous, purposeful and pervasive economic activities in this jurisdiction and throughout the United States.  The defendants intentionally and purposefully placed their vehicles and/or components in the stream of commerce in this jurisdiction and throughout the United States.  Subjecting the defendants to *in personam* jurisdiction in this jurisdiction does not violate the defendants' due process rights and comports with requirements of fair play and substantial justice.

11. Venue is conferred by 28 U.S.C. § 1391 as the defendants regularly and purposefully conducted business in this judicial district and a substantial part of the events giving rise to the claim occurred in this judicial district.

**The Parties**

Plaintiffs

12.  Plaintiff Ballou is an adult individual who resides in Orlando, Florida.  In March of 2012, Ballou purchased a new 2012 MINI Clubman S equipped with a class engine from an authorized Florida MINI dealer.  Ballou's class vehicle experienced primary chain assembly failure in February 2018.  At the time of the failure, her vehicle had 46,062 miles.  Ballou incurred considerable expense (approximately $3,000.00) replacing her class vehicle's primary timing chain after the original chain assembly prematurely failed.

Defendants

13. Defendant BMW AG is a duly organized German corporation with a principal place of business in the city of Munich in the province of Bavaria, Germany.  BMW AG designed, manufactured and tested the class engine in cooperation with PSA Peugeot Citroen, including but not limited to the primary chain assembly incorporated in class engines.  BMW AG drafted and published the Owner's Manual and Service and Warranty Information pamphlet and other

materials that accompanied class vehicles and/or were published on the Internet including the Media Information describing the maintenance-free timing chain in class engines that were disseminated to prospective class vehicle purchasers in the United States. BMW AG is the parent company of BMW LLC. BMW AG markets class vehicles under the MINI and/or MINI Cooper marque that are manufactured in various BMW factories in Europe.

14. Defendant BMW LLC is a duly organized Delaware corporation with a principal place of business located at 300 Chestnut Ridge Road in Woodcliff Lake, New Jersey. BMW LLC imports, distributes and/or sells MINI motor vehicles including all class vehicles and also acts as the authorized representative of BMW AG in the United States. BMW LLC operates its national marketing, warranty, consumer relations and engineering offices from its New Jersey facility including all activities concerning MINI. BMW LLC also controls all other aspects of its United States activities from New Jersey including class vehicle importation.

15. BMW LLC sells and distributes vehicles manufactured by both BMW AG and BMW LLC throughout the United States via a vast network of independent authorized dealerships. BMW LLC drafted and published the Owner's Manual and Service and Warranty Information pamphlet and other materials that accompanied class vehicles and/or were published on the Internet including the Media Information describing the maintenance-free timing chain in class engines that were disseminated to prospective class vehicle purchasers in the United States. BMW LLC acted, and continues to act, as the warrantor of vehicles constructed by both defendants sold in the United States.

16. At all relevant times, BMW LLC acted as an authorized agent, representative, servant, employee and/or alter ego of BMW AG performing activities concerning but not limited to advertising, marketing, warranties, warranty repairs, dissemination of technical information

and monitoring the performance of BMW vehicles in the United States, including substantial activities that occurred within this jurisdiction. There is sufficient overlapping and intertwining of the activities of BMW AG and BMW LLC in the United States that the principles of corporate separateness should not be applied.

17. New Jersey has the most significant relationship to the conduct that gave rise to this litigation since BMW LLCøs wrongful activities were orchestrated at its New Jersey headquarters. New Jersey law should govern all substantive aspects of this litigation. That conduct includes misrepresentation of class engine timing chain characteristics, concealing defects described in this complaint and other activities to deny warranty coverage to defective engine components that should have been replaced under the new vehicle warranty without cost to the class vehicle owner as described in this complaint.

**Class Action Allegations**

18. The proposed class representative brings this proposed action pursuant to Fed. R. Civ. P. 23(b)(1), 23(b)(2) and 23(b)(3) on behalf of herself and all members of the proposed class and state subclasses (or any other class authorized by the Court) defined as follows:

> **Nationwide Class**: All owners and former owners, lessees and former lessees of class vehicles who purchased or leased their vehicles in the United States and who sustained monetary loss and/or diminution of class vehicle value resulting from the defendantsø conduct as described in this complaint (hereinafter õproposed class membersö or õclass membersö or õthe Nationwide Classö). Excluded from the proposed class are the defendants together with their officers, directors, employees, assigns, and successors, the Court, Court staff, the defendantsø counsel and all respective immediate family members of the excluded persons and entities described above. Also excluded from the proposed class are any and all claims involving personal injury.

> **Florida Class:** All owners and former owners, lessees and former lessees of class vehicles who purchased or leased their class vehicles in Florida, and sustained monetary loss and/or diminution of class vehicle value resulting from the defendantsø conduct as described in this complaint (hereinafter õproposed Florida

class membersö or öthe Florida subclassö). Excluded from the proposed class are the defendants together with their officers, directors, employees, assigns, and successors, the Court, Court staff, defendantsø counsel and all respective immediate family members of the excluded entities described above. Also excluded from the proposed class are any and all claims involving personal injury.

**Numerosity of the Class: Fed. R. Civ. P. 23(a)(1).**

19. The proposed class is so numerous that individual joinder of all potential members is impracticable under Fed. R. Civ. P. 19 or 20. It is estimated there are in excess of approximately 100,000 class vehicles imported into the United States. Although the number, location and identity of all proposed class members can not be presently ascertained, this information is obtainable through discovery from the defendants.

**Existence of Common Questions of Law and Fact: Fed. R. Civ. P. 23(a)(2) and 23(b)(3).**

20. Common questions of law and fact exist as to all members of the proposed class and predominate any and all issues of law and fact affecting individual members of the proposed class. These issues include but are not limited to:

(a) Whether class engines were defectively designed or manufactured, including workmanship and materials, so as to subject the engine to premature failure of the primary chain assembly;

(b) Whether class engines sustained damage directly or indirectly by premature failure of the primary chain assembly;

(c) Whether class vehicles were sold with an Ownerøs Manual and/or Service and Warranty Information pamphlet and other materials that incorporated incorrect inspection and service intervals for the primary chain assembly;

(d) Whether the defendants breached their express warranties (including but not limited to the powertrain-limited warranty) in that class vehicles were defective with respect to engine design and manufacture, including workmanship and materials;

(e) Whether the defendants breached their implied warranties in that class vehicles were defective with respect to engine design and manufacture, including workmanship and materials;

(f) Whether the defendants intentionally or negligently misrepresented material facts concerning the characteristics of class engines particularly including the õlifetimeö primary chain;

(g) Whether the defendants committed unfair and deceptive business act practices by failing to inform owners of class vehicles prior to purchase and/or during the post-sale express warranty period that the primary chain assembly were defective and would fail shortly after the warranty period expired and cause damage to the engine, and that this defect posed a significant safety hazard;

(h) Whether the defendants were unjustly enriched by their warranty breaches and deceptive and/or unfair conduct described in this complaint;

(i) Whether proposed class members are entitled to monetary damages and injunctive relief pursuant to Rule 23(b)(2);

(j) Whether the Court should establish a constructive trust funded by the benefits conferred upon the defendants by their wrongful and unlawful conduct; and,

(k) Whether proposed class members are able to economically afford individual litigation against the defendants.

**Typicality of Claims or Defenses of a Definable Class: Fed. R. Civ. P. 23(a)(3).**

21. The proposed class representative's claims and defenses are typical of the claims and defenses of proposed class members. Class claims arise out of ownership or lease of class vehicles as defined in ¶ 1. There are no defenses to the proposed class representative's claims on the part of defendants that are unique or different from the proposed class.

**Adequate Representation: Fed. R. Civ. P. 23(a)(4).**

22. The proposed class representative will fairly and adequately protect the interests of the proposed class and subclasses. The proposed class representative's claims and the proposed class members' claims are so interrelated that the interests of the proposed class members will be fairly and adequately protected in their absence. The proposed class counsel have, in aggregate, over 60 years of experience concentrating in complex automotive products liability, and have been appointed class counsel in other proceedings. Neither plaintiffs nor their attorneys have any interests that are contrary to or conflicting with the class members.

**Superiority of a Class Action: Fed. R. Civ. P. 23(b)(3).**

23. Maintenance of a class action in one court is the most economical procedural device to litigate the class vehicle and class engine claims for class vehicle owners and the defendants. Prosecution of separate actions by individual members of the class could create risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class as recognized by Fed. R. Civ. P. 23(b)(1)(A).

24. Prosecution of separate actions by individual members of the class could create risk of adjudications with respect to individual members of the class which would, as a practical matter, be dispositive of the interests of the other members of the class who are not parties to the

adjudications or substantially impair or impede their ability to protect their interests as recognized by Fed. R. Civ. P. 23(b)(1)(B).

25. There is a substantial likelihood that the defendants will oppose this class action and will further act or refuse to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole impractical as recognized by Fed. R. Civ. P. 23(b)(2).

26. Questions of law and fact common to members of the class predominate over any questions affecting any individual members and a class action is superior to other available methods for the fair and efficient adjudication of the controversy as recognized by Fed. R. Civ. P. 23(b)(3).

**Class Engine Chain Assembly Defects**

27. If designed and manufactured correctly, engine primary chain assemblies should last a minimum of 150,000 miles in a modern automobile such as the class vehicles. This is demonstrated by the defendants' Service and Warranty Information pamphlet and other materials accompanying class vehicles, the defendant's marketing and media statements, other engines manufactured by the defendants incorporating chain assembly and performance of comparable competitor vehicles.

28. Class engines use a hydraulic chain tensioner incorporating an internal coil spring and oil passages to regulate tension on the chain-tensioning rail that applies tension to the primary chain. This tension keeps the chains from jumping the teeth on the sprockets that are attached to the crankshaft and camshafts. This tension also maintains synchronization between rotating engine components including the cylinder valves and pistons. Without proper chain tension and synchronization, the engine will run very poorly (if at all) and/or, if sufficient chain

skip and mis-synchronization occurs, its failure to function properly will cause cylinder valves and pistons to collide, resulting in severe internal engine damage.

29.  The defendants have concealed primary chain assembly durability issues since before 2011 when they learned certain information and subsequently changed the Condition Based Service engine oil change intervals for class engines from 15,000 to 10,000 miles after discovering longer intervals were contributing to premature chain elongation and separation. The defendants did not disclose this information to existing class vehicle owners or potential purchasers.

30.  The defendants purposefully ignored the primary chain assembly defects for years in order to avoid substantial costs associated with remedying these defects under warranty.

31.  Aside from chain separation, another cause of primary chain assembly failure is chain stretch.  When this condition occurs, slack introduced into the primary chain assembly causes misalignment of the camshafts and crankshaft synchronization.  As the chain stretch condition worsens and the capacity of the hydraulic chain tensioners is exceeded, chain slippage on the camshaft/crankshaft sprocket teeth will eventually allow sufficient camshaft and crankshaft synchronization misalignment where the engine pistons collide with the cylinder valves causing catastrophic engine damage.

32.  Defendants' prior knowledge is demonstrated by the following facts:

- Defendants maintain a Warranty Optimization section in their Warranty Department at BMW LLC's headquarters in New Jersey, which contemporaneously tracks warranty data for various parts in the class vehicles, including class engine chain assemblies, to determine failure rates and perform root cause analysis;

- Defendants maintain Warranty Specialists at their U.S. Headquarters in New Jersey who contemporaneously analyze warranty data maintained in BMW LLC's intranet database available to personnel at the U.S. Headquarters to identify failure rates and trends;

- Defendants also maintain a Launch Viability Function Integration section whose responsibilities in the U.S. include extensive pre-launch testing of vehicles; organizing and leading vehicle test events at multiple test facilities;

- Defendants also maintain a division that includes engineers who inspect and analyze defects and failure as they occur in the field;

- Defendants revised the 15,000 mile / 24 month Condition Based Service engine oil change intervals to 10,000 miles / 12 months in an attempt to limit premature failure of internal engine components including the primary chain in mid 2012; and,

- Defendants are required to assiduously track and review complaints filed by owners of class vehicles with NHTSA to ensure that any defects requiring a recall are promptly reported to NHTSA within five (5) days.

33. Complaints online, which are carefully monitored by defendants, demonstrate failed primary chain assemblies in class engines.  Recently, because of the prevalence of the occurrence of failures, independent MINI vehicle repair shops also have posted a description of the chain assembly failures occurring with class engines on their websites as part of their marketing program for chain replacement and parts sales.

**Complaints to the National Highway Traffic Safety Administration**

34. The National Highway Traffic Safety Administration ("NHTSA") Office of Defects Investigation ("ODI") maintains a database of complaints filed by consumers concerning defects in their motor vehicles and vehicle equipment.  The NHTSA-ODI website allows consumers to

14

õidentify and report problems you might be having with your vehicle, tires, equipment or car seats.ö *See* https://www-odi.nhtsa.dot.gov/ivoq/ (last accessed May 23, 2018) (õIf you think you have a problem, we want you to tell us about it.ö)  Set forth below are complaints submitted by owners of class vehicles and reported to the NHTSA demonstrating that the N16 and N18 chain defect was known to the defendants and constitutes an unreasonable safety hazard:[8]

---

**Date Complaint Filed:** 03/31/2016
**Component(s):** ENGINE
**Consumer Location:** NEWTOWN, PA

**Date of Incident:** 03/21/2016
**NHTSA ID Number:** 10852760

**All Products Associated with this Complaint** ▲

| Vehicle Make | Model | Model Year(s) |
| --- | --- | --- |
| MINI | COOPER COUNTRYMAN | 2012 |

0 Available Documents

**Details** ▲

**Crash:** No    **Fire:** No    **Number of Injuries:** 0    **Number of Deaths:** 0
**Manufacturer:** BMW of North America, LLC
**Vehicle Identification No. (VIN):** WMWZC3C54CW...
**SUMMARY:**
TIMING CHAIN STRETCHED CAUSING TIMING TO BE OFF BY 75MM, THIS RESULTED IN DAMAGE TO THE ECCENTRIC SHAFT AND TIMING CHAIN. ENGINE ENGINE MALFUNCTION LIGHT ILLUMINATED, UPON INSPECTION AT MINI DEALER DETERMINED THE ABOVE CONDITION OF VEHICLE

*                    *                    *

---

**Date Complaint Filed:** 03/31/2016
**Component(s):** ENGINE
**Consumer Location:** CANOVANAS, PR

**Date of Incident:** 03/28/2016
**NHTSA ID Number:** 10852609

**All Products Associated with this Complaint** ▲

| Vehicle Make | Model | Model Year(s) |
| --- | --- | --- |
| MINI | COOPER S | 2012 |

0 Available Documents

**Details** ▲

**Crash:** No    **Fire:** No    **Number of Injuries:** 0    **Number of Deaths:** 0
**Manufacturer:** BMW of North America, LLC
**Vehicle Identification No. (VIN):** WMWSV3C50CT...

---

[8] NHTSA-ODI does not share complainantsø personal information with the general public. A complaint is only added to a public NHTSA database only after it removes all information from complaint fields that personally identify a complainant. NHTSA-ODI complaints are made by individuals who must identify themselves, enter detailed contact information and vehicle information (including an accurate VIN) before the complaints are reviewed and analyzed by NHTSA.  There are penalties for submitting false statements.

**SUMMARY:**
ENGINE RATTLING NOISE (TIMING CHAIN AND TENSIONER) AT ALL TIMES, VEHICLE HAS ONLY 50,000

       \*         \*         \*

| | |
|---|---|
| **Date Complaint Filed:** 11/15/2017 | **Date of Incident:** 10/30/2017 |
| **Component(s):** ENGINE | **NHTSA ID Number:** 11046285 |
| **Consumer Location:** MILWAUKEE, WI | |

**All Products Associated with this Complaint ▲**

| Vehicle Make | Model | Model Year(s) |
|---|---|---|
| MINI | COOPER COUNTRYMAN | 2012 |

Details ▲                         0 Available Documents

**Crash:** No     **Fire:** No     **Number of Injuries:** 0     **Number of Deaths:** 0
Manufacturer: BMW of North America, LLC
Vehicle Identification No. (VIN): WMWZC5C57CW...
SUMMARY:
I PURCHASED THE USED 2012 MINI COOPER COUNTRYMAN, I DROVE IT FOR 84 DAYS, AND WHILE I
WAS DRIVING THE CAR THE ENGINE SUDDENLY WENT DEAD ON THE ROAD AND STOPPED
WORKING. I TOOK THE CAR TO THE DEALER WHERE I BOUGHT IT FROM AFTER TWO WEEKS THEY
SAID THE TIMING CHAIN BROKE AND CAUSED IT TO DESTROY THE ENGINE, NOW I HAVE TO PAY
FOR THE NEW ENGINE. I CHECKED ON LINE TO SEE IF THERE WERE ANY PROBLEMS WITH TIMING
CHAIN ON THESE CARS, MINI SAID THEY HAD PROBLEMS IN THE PREVIOUS MODEL CARS THAT
MADE AND THEY FIXED THE PROBLEM, APPARENTLY THE PROBLEM STILL EXIST IN THE NEWER
MODELS.

       \*         \*         \*

| | |
|---|---|
| **Date Complaint Filed:** 04/12/2016 | **Date of Incident:** 03/15/2016 |
| **Component(s):** ENGINE | **NHTSA ID Number:** 10855015 |
| **Consumer Location:** SAN FRANCISCO, CA | |

| Vehicle Make | Model | Model Year(s) |
|---|---|---|
| MINI | COOPER S | 2011 |

Details ▲                         0 Available Documents

**Crash:** No     **Fire:** No     **Number of Injuries:** 0     **Number of Deaths:** 0
Manufacturer: BMW of North America, LLC
Vehicle Identification No. (VIN): WMWMF7C52AT...
SUMMARY:
TL* THE CONTACT OWNS A 2011 MINI COOPER S. WHILE DRIVING 70 MPH, THERE WAS AN
ABNORMAL NOISE COMING FROM THE FRONT PASSENGER SIDE OF THE VEHICLE. THE VEHICLE
WAS TAKEN TO A DEALER WHO DIAGNOSED THAT THE TIMING CHAIN FRACTURED AND NEEDED TO
BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOT NOTIFIED OF
THE FAILURE. THE FAILURE MILEAGE WAS 47,000. UPDATED 06/15/16*LJ

       \*         \*         \*

## Tolling of the Limitations Period

35. The fraudulent conduct of the defendants tolls any applicable statutes of limitations

since the fraudulent misrepresentations concerning the true cause of failures in class vehicles was

inherently unknowable to plaintiffs and the class given the technical nature of the class vehicle design and manufacturing defects, including materials and workmanship.

36. Class vehicle owners do not possess the requisite technical skills in automotive engineering to discern the design, manufacture, materials and workmanship defects in their vehicles or the requisite technical skills to surmise the proper vehicle maintenance and maintenance intervals for class vehicles.

37. The statutory and case law of state consumer protection laws, together with the doctrine of equitable tolling and/or the discovery rule, toll the applicable statutes of limitations for all class vehicles because of the defendants' fraudulent conduct, including but not limited to concealment of class vehicle defects and omission of material facts.

38. Some proposed class members relied on the defendants' fraudulent misrepresentations concerning the cause of class engine failures and therefore delayed bringing suit against the defendants. These misrepresentations relate to the fact that, in reality, class engines were failing due to manufacture, materials and/or workmanship defects. The defendants, however, fraudulently attributed the failings of class vehicle chain assemblies to other factors and/or exculpating conditions for which the defendants had no responsibility.

39. The defendants are estopped from asserting that statutes of limitations were running for the duration of time class members relied on the defendants' fraudulent representations.

40. The defendants are equitably estopped from asserting the statutes of limitations have run against the claims of class members.

**Further Allegations**

41. The defendants fraudulently, intentionally, negligently and/or recklessly concealed from the proposed class representative and proposed subclass members the defects in the class

17

engines even though the defendants knew or should have known of design, materials and manufacturing defects in class vehicles if the defendants had adequately tested class engines.

42. The defendants had actual knowledge that design, manufacturing, materials and/or workmanship defects were causing extensive irreversible premature performance degradation in class engine chain assemblies shortly after production of the class vehicles commenced.

43. Defendants engaged in extensive field research and quality investigations and analysis before revising the specifications for the defective part, rebidding the new part and manufacturing and distributing the new part. In addition, defendants have and continue to be under a legal obligation pursuant to federal law to monitor defects that can cause a safety issue and report them within five (5) days of learning of them. The defendants therefore assiduously monitor the NHTSAóODI website and the complaints filed therein in order to comply with their reporting obligations under federal law.

44. The defendants failed to inform class vehicle owners prior to purchase or during the express warranty period that their engine primary chain assembly were defective and would fail shortly after the express warranty period expired. The defendants misrepresented by affirmative conduct and/or by omission and/or by fraudulent concealment the existence of defects in the class engine.

45. The defendants also failed to inform class vehicle owners at the time of purchase that the primary chain assembly in their class vehicleøs engine had been inadequately tested prior to placing the car in production and the time of vehicle sale.

46. Class vehicles were accompanied by a limited warranty õagainst defects in materials or workmanshipö for õ48 months or 50,000 miles, whichever occurs firstö from õthe date of first retail sale or the date the vehicle is first placed into service as a sales demonstrator, Aftersales

18

Mobility Program (AMP) Vehicle or company vehicle, whichever is earlier.ö   Specifically covered by this powertrain limited warranty were õall internal [engine] partsö including the engine chain assembly.   This warranty promised to repair or replace covered defective class engine components arising out of defects in materials and/or workmanship for a period of 4 years or 50,000 miles, whichever occurs first for non-commercial purchasers.

47. The defendants also knew since prior to 2011 (taking into account the necessary lead time for the final implementation of the 15,000 mile Condition Based Service engine oil change intervals in 2012) that class engines were experiencing premature engine chain assembly failures because of oil lubrication issues.   Despite this knowledge, the defendants continued to sell class vehicles with chain assemblies that were defective and did not replace the defective chain assembly in class vehicles already sold but still under warranty.   This knowledge is imputed to BMW AG because BMW LLC was monitoring warranty claims and class vehicle performance in the United States, and reporting back to its parent companies located in Germany.

48. The proposed class representative and proposed class members had valid and binding warranties and contracts with the defendants and were reasonably expected by the defendants to use their respective class vehicles in the manner in which passenger motor vehicles were used.

49. The proposed class representative and proposed class members complied with all warranty and contractual obligations including all warranty, warranty notice, maintenance and product use obligations for their respective class vehicles.   The proposed class representative and proposed class members operated their class vehicles under normal anticipated conditions in noncommercial environments.

50. The defendants have timely received notice of their breach of warranty claims through authorized representatives contacted by the proposed class representative and have suffered no resulting prejudice.

51. The proposed class representative was informed by a representative of BMW LLC that BMW LLC would not provide assistance in repairing her class engine because her vehicle was outside of the express warranty period.

52. The defendants refused to fully reimburse or compensate the proposed class representative for vehicle repair expenses or provide a suitable substitute or replacement vehicle. Although her vehicle's chain assembly failure occurred outside the unilateral express warranty period (the length of which was not bargained for prior to purchase), the proposed class representative's class vehicle exhibited unmistakable symptoms (known only by the defendants) of degradation and impending premature chain failure within the express warranty period.

53. Despite actual and constructive knowledge of class vehicle defects as described in this complaint, the defendants failed to cure class vehicle defects within the express warranty period and thereby breached the terms of the express warranty.

54. Through no fault of their own, the proposed class representative and proposed class members did not possess sufficient technical expertise to recognize symptoms of impending chain assembly failure. This information, however, was well known to the defendants, but not revealed.

55. The proposed class representative relied upon material misrepresentations, fraudulent statements and/or material omissions of employees and agents of the defendants at the time of purchase, including but not limited to the useful and expected life of class vehicles including the

fact that major internal engine assemblies (including the timing chain were maintenance free for the anticipated life of the engine) and the recommended class vehicle maintenance program.

56. The defendants' misrepresentations and fraudulent statements were received by the proposed class representative prior to and at the point of her class vehicle purchase.  These representations were made by MINI dealers referencing publications concerning class vehicles including the Owner's Manual and the Service and Warranty Information pamphlet, marketing and media information and other materials.  The representations created a reasonable belief the useful life expectancy of class vehicles without a major engine failure was in excess of 150,000 miles.  These representations specifically related that the engine primary chain assemblies were non-maintenance engine lifetime components.

57. The defendants actively concealed the true reasonably expected duration of class vehicle components, including but not limited to the primary chain assembly, from the proposed class representative and all class vehicle purchasers.  The defendants intentionally failed to inform class vehicle purchasers that class vehicles incorporated defective and/or improperly tested primary chain assembly that would prematurely fail within the reasonably expected useful life of the vehicle.

58. The defendants intentionally failed to inform class vehicle purchasers that the primary chain assembly incorporated in class vehicles results in higher operational costs than alternative conventional chain assemblies or other competitive technology because the class engine primary chain assembly prematurely fails within the reasonably expected useful life of the vehicle.

59. The defendants actively and fraudulently concealed the existence of class vehicle material, manufacture and/or design defects (including defects covered under class vehicle warranties concerning materials and workmanship) and that the Owner's Manual and Service

and Warranty Information pamphlet accompanying class vehicles incorporated improper maintenance recommendations and maintenance intervals.

60. The proposed class representative and class members did not learn that the chain assembly in their respective class vehicle was defective until after their respective chain assembly failed.

61. The defendants' customer service telephone representative made false and fraudulent representations to class members as to the cause and existence of chain assembly defects in class vehicles although the service representative received hundreds of consumer complaints that class vehicles prematurely failed. The defendants' employees falsely represented certain conditions for which the defendants were not responsible as the basis for the failures that were in fact caused by a defect in materials, manufacturing and design. They falsely stated that defendants were not responsible for the resulting class vehicle failures and/or denied the existence of known class vehicle defects.

62. Authorized MINI dealers did not have knowledge of and/or were counseled not to admit that any defects existed in class vehicles or that improper maintenance recommendations were incorporated in the Owner's Manual and Service and Warranty Information pamphlet. MINI dealers (who also had a vested financial interest in concealing and suppressing the actual cause of class vehicle failures) improperly blamed vehicle failures on certain conditions for which the defendants would not be responsible and/or denied the existence of defects in the primary chain assembly.

63. The defendants had actual knowledge, constructive knowledge and/or should have known, upon proper inquiry and testing, that class vehicles were defective with respect to their primary chain assembly, suffered from extensive irreversible premature performance degradation

22

during the warranty period and did not have a normal and/or reasonable useful life before sales of class vehicles commenced in the United States. This information was technical in nature, proprietary and not known by the ordinary consumer or the public, including the proposed class representative and proposed class members. The proposed class representative and proposed class members were ignorant of this technical information through no fault of their own.

64. The defendants acted to conceal the chain assembly defects during the warranty period so that repair costs would be shifted to the proposed class representative and proposed class members once the warranty expired and their primary chain assembly failed.

65. Although the defendants knew that defects in class engines caused premature failure of the chain assembly, the defendants knowingly and actively concealed material information from prospective purchasers and actual purchasers with the intent to deceive purchasers and promote class vehicle sales.

66. The defendants' knowledge of class engine chain defects was derived from warranty claims, field investigations, claims supervisors, customer complaints and monitoring of performance of class vehicles by BMW LLC quality assurance employees. Additionally, the number of replacement components and subsequent component revisions would have placed the defendants on notice of class vehicle defects. Knowledge of class vehicle defects is further imputed to the defendants prior to sale of certain model year class vehicles because predecessor Prince N14 engines using substantially similar chain assembly components were also prematurely failing within their reasonably expected life and were the subject matter of an engine timing chain system class action captioned *Skeen, et al. v. BMW of North America, LLC, et al.*, United States District Court for the District of New Jersey Civil Action No. 2:13-cv-01531-

WHW-CLW.[9]  The defendants elected to place into the stream of commerce class vehicles that they knew would be adversely affected by the failure to adequately design and manufacture the primary chain assembly.

67. Additional information supporting allegations of fraud and fraudulent conduct is in the control of the defendants.  This information includes but is not limited to technical root cause analyses, communications with class vehicle owners, remedial measures, warranty claims and internal corporate communications concerning how to deal with consumers who claim their class enginesøchain assemblies were defective.

68. Material information fraudulently concealed and/or actively suppressed by the defendants includes but is not limited to class vehicle defects described in the preceding paragraphs.

69. Material information was fraudulently concealed and/or actively suppressed in order to sell class vehicles to uninformed consumers (including the proposed class representative and proposed class members) premised on affirmations and representations of reliable, high quality German engineered, long-life vehicles with low maintenance, inexpensive operating costs, superior performance and durability.  In fact, class vehicles actually contained a known chain assembly defects that would severely affect the useful life of the vehicle.

---

[9] The defendants also faced similar timing chain defect allegations involving the Prince family engine in at least three other putative federal court class action proceedings. *See Brown v. BMW of North America, LLC*, United States District Court for the Southern District of California Civil Action No. 3:14-cv-00950-JLS-BLM; *Curran v. BMW of North America, LLC*, United States District Court for the District of New Jersey Civil Action No. 2:13-cv-4625-WHW-CLW; *Kahn v. BMW of North America, LLC*, United States District Court for the Eastern District of New York Civil Action No. 2:14-cv-02463-ADS-ARL; and *Quinlan v. BMW of North America, LLC*, United States District Court for the Southern District of Ohio Civil Action No. 1:14-cv-00485-MRB.

70. The defendants (and particularly the sales and marketing executives at BMW LLC) advertised and otherwise created the reasonable expectation (including but not limited to scheduled class engine maintenance recommendations) that class vehicles would last over 150,000 miles or ten years before experiencing chain assembly failure.  Material information was fraudulently concealed and/or actively suppressed in order to protect the defendants' (and authorized vehicle dealers') corporate profits from loss of sales from adverse publicity, to reduce warranty repair costs and to limit BMW's brand disparagement.

71. The defendants had a duty to disclose to class vehicle owners that there were materials and manufacture defects in class vehicles and that the Owner's Manual and Service and Warranty Information pamphlet set forth the wrong maintenance recommendations and maintenance intervals.

72. This duty arose because the defendants knew that there were defects in the vehicles and inaccuracies in the Owner's Manual and Service and Warranty Information pamphlet that affected vehicle operation and safety while class vehicle owners were not, and could not reasonably be, cognizant of these defects and dangers.

73. The defendants continuously and affirmatively concealed the actual characteristics of class vehicles from the proposed class representative and other purchasers.  The defendants breached their affirmative duty of disclosure to class vehicle owners (and particularly to owners who inquired as to the cause of class vehicle failures).[10]

---

[10] Since unexpected engine failure is a serious safety issue, the defendants had an affirmative duty to disclose class vehicle defects together with associated risks.  While operating her vehicle, the engine chain system malfunctioned.  Plaintiff Ballou was able to safely park here car and shut off the engine.  The vehicle was towed to the local authorized MINI dealer.

74. The defendants breached express and implied warranties and actively and affirmatively misrepresented, fraudulently concealed and suppressed, both pre-sale and post-sale, the existence of defects in class vehicles and omissions in the accompanying Owner's Manual, Warranty and Maintenance pamphlet and other materials referenced in this complaint.

75. The warranties accompanying class vehicles were procedurally and substantively unconscionable under the Uniform Commercial Code § 2-302 and other applicable state warranty laws because of the disparity in bargaining power of the parties, the purchasers' lack of knowledge that class vehicles were defective, the inability of class vehicle purchasers to bargain with the defendants to increase durational warranties, their lack of knowledge of the defect, their lack of meaningful alternatives, disparity in sophistication of the parties, unfair terms in the warranty (including but not limited to durational warranties that unfairly favored the defendants particularly where there were class vehicle defects known only to the defendants and the warranty unfairly shifted repair costs to consumers when class vehicles prematurely fail during their reasonably expected life), absence of effective warranty competition and the fact that class vehicles fail with substantially fewer miles of operation than competitive vehicles from other manufacturers or models identical to class vehicles except for an engine with a belt driven valve train rather than the class engine chain driven valve train.[11]

---

[11] The Uniform Commercial Code § 2-302 states in pertinent part:
(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.
(2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.

76. Purchasers of class vehicles reasonably expect vehicles to function well in excess of the class vehicles' durational warranties before requiring extensive expensive repairs. This is particularly true where the purchasers of class vehicles were led to believe by the defendants' representations and typical consumer expectations in a commercial context that the useful expected life of the vehicles was in excess of 150,000 miles and there was no scheduled inspection or maintenance for the chain assembly within this period.

77. Given the conduct of the defendants and the manufacture, materials, design and workmanship defects in class vehicles (that the defendants knew were inherently defective prior to the time of sale as well as post-sale), the durational limitations of the warranties are oppressive, unreasonable and unconscionable because the warranty disclaimers of the proposed class representative and proposed class members were neither knowing nor voluntary.

78. The proposed class representative and proposed class members had an absence of any meaningful choice in the purchase of class vehicles and the contractual terms were unreasonably favorable to the defendants since the defendants were fully aware of defects in the class vehicles that substantially reduced the expected useful life of the vehicle. The proposed class representative and proposed class members were unaware of defects in the class vehicles at the time of purchase.

79. The bargaining position of the defendants for the sale of class vehicles was grossly disproportionate and vastly superior to that of individual vehicle purchasers, including the proposed class representative and proposed class members. This is because the defendants knew there were defects in class vehicles affecting the durational operation and operating costs.

80. The defendants included unfair contractual provisions concerning the length and coverage of the express warranty when they knew that class vehicles were inherently defective and dangerous and had been inadequately tested.

81. The defendants knew defects in class vehicle components would cause certain expensive repair failures within one-half of the useful expected life of the vehicle. The defendants artificially limited the duration of the warranty period to avoid performing warranty repairs in order to maximize profits through the sale of defective vehicles.

82. To the extent that the Defendants posit that the materials are intentionally selected and therefore do not constitute a defect covered by the warranty as a materials or manufacturing defect, the warranty fails of its essential purpose pursuant to Uniform Commercial Code § 2-719(2).

83. The defendants unconscionably sold defective class vehicles to the proposed class representative and proposed class members without informing these purchasers that the class vehicles were defective. In the alternative, the defendants failed to notify the proposed class representative and proposed class members after the time of sale that the primary chain assembly had been improved and engine maintenance revised and that the assembly in their respective vehicles should be replaced prior to the expiration of the warranty.

84. The defendants' conduct renders the vehicle purchase contract so one-sided as to be unconscionable under the circumstances existing at the formation of the vehicle purchase contract.

85. The durational limitation of the express warranties accompanying the class vehicles is unreasonable and unconscionable since the defendants actively concealed known vehicle defects

and issued incorrect maintenance recommendations and maintenance intervals. The proposed class representative and proposed class members had no notice of or ability to detect the defects.

86. The defendants restricted the limited power train warranty (including the class engine) duration to 4 years or 50,000 miles (whichever occurs first) for class vehicles in an effort to avoid the cost of repairs because they were cognizant of class vehicle defects that existed at the time of sale.

87. Engines in competitive vehicles manufactured and sold at the time the class vehicles were manufactured and sold ordinarily last longer than warranted by the limited power train warranty accompanying class vehicles.

88. The defendants engaged in unconscionable fraudulent commercial practices and attempted to conceal class vehicle materials defects, workmanship defects, manufacturing defects, and improperly recommended maintenance.

89. The defendants are engaged in a continuing fraud concerning the true underlying cause of class vehicle failures.

90. The defendants failed to adequately test class vehicles in appropriate consumer environments prior to marketing, distribution and sale.

91. The defendants' unconscionable conduct precludes any exclusion of incidental and consequential damages or any other limitation of remedies. The defendants' upper level management orchestrated this wrongful conduct.

92. The proposed class representative and proposed class members operated and maintained their class vehicles in conformity with the respective Owner's Manual and Service and Warranty Information pamphlet and provided the requisite notice to the defendants' authorized agents for warranty repair after their class vehicles failed.

93. Even if class vehicles do not fail entirely, class vehicle owners have sustained an ascertainable financial loss, including but not limited to increased maintenance costs for primary chain assembly inspections and/or premature replacement of the primary chain assembly and/or substantially reduced engine performance.

94. Individuals who own or have owned class vehicles also sustained diminution of the resale value of their class vehicles since knowledge of problems with class vehicles became public information after the time of their purchase.

95. The proposed class representative and proposed class members have not received the benefit of their bargain concerning their respective purchase of class vehicles.

96. The defendants created an over-all misleading impression through their failure to disclose material information concerning the fact that class vehicles incorporated defective chain assemblies and were accompanied by an Owner's Manual and Service and Warranty Information pamphlet that incorporated incorrect engine service and maintenance recommendations. The proposed class representative and proposed class members were deceived by the defendants' conduct as described in this complaint with respect to their purchase of class vehicles.

97. The defendants violated the consumer protection laws of Florida together with all other state consumer protection laws with their oppressive and unconscionable conduct described in this complaint including but not limited to their failure to disclose material information that caused ascertainable financial harm to the proposed class representative and proposed class members.

98. The defendants were under a duty to disclose safety defects to class vehicles as described in this complaint but failed to disclose to the proposed class representative and proposed class members the characteristics of class vehicles with respect to defects in violation

30

of the consumer protection laws of Florida together with all other state consumer protection laws. The defendants' knowing omissions (that class engines were defective and that this defect constituted a safety hazard) deceived purchasers (including but not limited to the proposed class representative and proposed class members). Those knowing disclosure omissions include the fact that class vehicle defects had a significant impact on the value, durability and future care of class vehicles. This failure to disclose additional information concerning class vehicle defects had the capacity to, and in fact did, deceive purchasers (including but not limited to the proposed class representative and proposed class members) in a material respect.

99. If the proposed class representative and proposed class members had been made aware of the defects in their respective class vehicles and the attendant ramifications of value, durability, maintenance expenses, safety and care, they would not have purchased the class vehicles or would have paid less for their vehicles since class members were led to believe that they were purchasing a vehicle that was free of major defects and were not fully informed of the true characteristics and attributes of class vehicles.

100. The defendants fraudulently, intentionally, negligently and/or recklessly concealed from the proposed class representative and proposed class members defects in class vehicles even though the defendants knew information concerning these defects was material and central to the marketing and sale of class vehicles to prospective purchasers including the proposed class representative and proposed class members.

101. As a direct result of these knowing omissions, the proposed class representative and proposed class members purchased class vehicles and sustained economic harm since they purchased vehicles worth considerably less than represented. These misrepresentations diminish

the class vehicle value and increase the cost of vehicle ownership while also increasing risk of injury that was not disclosed to or reasonably anticipated by consumers at the time of purchase.

102. The wrongful conduct of the defendants in violation of the consumer protection laws of Florida together with all other state consumer protection laws occurred within the limitations period set out in the respective statutes and/or the limitations period is tolled by the defendantsø conduct.

**What the Omissions Were:**

103. The defendants fraudulently omitted to disclose material facts basic to both the purchase, maintenance and warranty repairs concerning class vehicles, including information concerning class engine chain assembly defects, as described in ¶¶ 2-8 and 27-34 and other paragraphs of this complaint, in an effort to deceive purchasers.  At the time of purchase, the defendants fraudulently omitted to disclose material facts regarding the defects in class vehicles, including their impact on future repairs, operating costs and vehicle reliability.  The defendants fraudulently concealed from the proposed class representative and proposed class members defects in class vehicles even though the defendants knew or should have known that information concerning these defects was material and central to the marketing and sale of class vehicles to prospective purchasers, including the proposed class representative and proposed class members.

104. Class engine defects pose a serious safety issue while the vehicle is being operated since there may be an unanticipated loss of engine power without warning and reduced braking caused by lack of engine vacuum.  In class vehicles equipped with manual transmissions, the drive wheels will lock and cause loss of directional stability and steering.  In other instances, the engine may fail to start, leaving the driver and passenger stranded mid-journey.

105. Primary chain failure is caused by materials and design that are required to be high-wear resistant but instead are made of insufficient materials which fail to prevent high resistance wear, resulting in premature chain elongation, chain sprocket damage, chain slippage and/or chain separation.

106. The defendants concealed from the proposed class representative and proposed class members during their warranty periods that a defect existed with the class engine chain assembly materials, which could have and should have been fixed during the warranty period, particularly as it was a safety issue, and defendants' withholding of this material information deprived the proposed class representative and proposed class members of the right to have such defective part replaced for free under the warranty.

**The Person(s) Responsible for the Failure to Disclose:**

107. The proposed class representative and proposed class members are entitled to the reasonable inference that the defendants' sales, marketing, engineering and warranty departments and their executives were involved in the omissions.

**The Context of the Omissions and the Manner in which they Misled:**

108. Material information was fraudulently concealed and/or actively suppressed in order to sell class vehicles to uninformed consumers (including the proposed class representative and proposed class members) premised on affirmations and representations as described in this complaint.

109. If the proposed class representative and proposed class members had been informed of defects in their class vehicles, they would not have purchased their respective class vehicles or would have paid substantially less.  If the proposed class representative and proposed class members had been made aware of the defects in their respective class vehicles and the attendant

ramifications of their respective vehicle's diminution in value, future cost of repairs, durability and care, they would not have purchased the class vehicles since each class member believed they were purchasing vehicles without major defects and were not fully informed of true characteristics and attributes of class vehicles. If the proposed class representative and proposed class members had been informed of the defect during the warranty period, they would have had the defective part replaced under warranty. The defendants' conduct that violated the consumer fraud statutes alleged herein deprived the proposed class representative and proposed class members of that remedy.

**What the Defendants Obtained through the Fraud:**

110. Material information concerning class vehicles was concealed and/or actively suppressed in order to protect the defendants' corporate profits from loss of sales, purchase refunds, warranty repairs, adverse publicity and brand disparagement. Purchasers believed they were obtaining vehicles having attributes as represented by the defendants and were accordingly deprived of economic value and paid a price premium for their class vehicles that did not in fact have the described attributes. The defendants had a uniform policy of not properly disclosing class vehicle defects in order to promote sales and increase profits as described in this complaint.

111. As a proximate and direct result of the defendants' unfair and deceptive business trade practices, the proposed class representative and proposed class members purchased class vehicles and sustained an ascertainable loss, including but not limited to financial harm as described in this complaint.

**COUNT I**
**BREACH OF EXPRESS WARRANTY**

(On Behalf of the Nationwide Class or, Alternatively, the Florida Subclass)

112. Proposed class representative Ballou and proposed class members incorporate by reference all allegations in the above preceding paragraphs as if set forth fully in this count.

113. The defendants are merchants with respect to passenger motor vehicles.  Class vehicles are goods within the meaning of the Uniform Commercial Code as adopted by New Jersey and all other adopting states including Florida.

114. The defendants provided class members an express powertrain limited warranty of "4 years or 50,000 miles whichever occurs first, from date the vehicle was first placed in service."  Specifically covered by this powertrain-limited warranty were "all internal [engine] parts" including the engine primary chain assembly.  This warranty promised to repair or replace covered defective class engine components arising out of defects in materials and/or workmanship for a period of 4 years or 50,000 miles, whichever occurs first for non-commercial purchasers.

115.  Plaintiff Ballou requested the defective timing chain assembly be replaced in her class vehicle under the warranty or that she be reimbursed for the cost of repair and replacement, which request defendants denied.

116. The proposed class representative and proposed class members complied with maintenance recommendations for their respective class vehicle.  The defendants failed to remedy by replacement or repair the proposed class representative and proposed class members' chain assemblies that were defective in material and workmanship during the express warranty period although these defects were known to the defendants at that time.[12]  Class vehicles owned

---

[12] The Service and Warranty Information materials for class vehicles recites as follows:

by the proposed class representative and proposed class members also prematurely failed and/or experienced substantial performance diminution within the express warranty period of 4 years or 50,000 miles.

117. Because of the chain assembly defects, class vehicles are not reliable and owners of these vehicles have lost confidence in the ability of class vehicles to perform the function of safe reliable transportation.

118. The proposed class representative and proposed class members could not have reasonably discovered the defective condition of their class vehicle engines prior to failure.

119. The express warranty remedy set out in the warranty provisions accompanying class vehicles fails of its essential purpose under Uniform Commercial Code § 2-719(2) and the limitation of consequential damages is unconscionable under § 2-719(3) because of the conduct of the defendants described in this complaint.

120. The defendants breached their express warranties in that class vehicles were defective with respect to engine materials, workmanship and manufacture. The defendants further breached their express warranties in that class vehicles were accompanied by an Owner's Manual and Service and Warranty Information pamphlet that incorporated no inspection and service intervals for the primary chain assembly although the defendants knew these components were defective and required periodic inspection and service.

---

To obtain warranty service coverage, the vehicle must be brought, upon discovery of a defect in material or workmanship, to the workshop of any authorized MINI dealer in the United States or Puerto Rico, during normal business hours. The MINI dealer will, without charge for parts or labor, either repair or replace the defective part(s) using new or authorized remanufactured parts. The decision to repair or replace said part(s) is solely the prerogative of the MINI Division.

121. The defendants further breached their express warranties by failing to remedy the chain assembly defects caused by defects in materials and workmanship as required by the warranty that accompanied the respective class vehicles.

122. The proposed class representative and proposed class members relied on express warranties made by the defendants concerning class vehicles and sustained financial injury resulting from the breach of those warranties by the defendants including replacement of chain assemblies and repair of resulting engine damage.

123. The proposed class representative and proposed class members could not have reasonably discovered the defective condition of the class vehicles. The defendantsø breach of their express warranties was the direct and proximate cause of the proposed class membersø financial harm.

124. The proposed class representative and class members reported to the defendants the problems with and failings of the primary chain assemblies in their vehicles and requested that the defendants cure and/or repair and/or replace the defective chain components. The defendants received adequate notice of their breach of their express warranties and failed to cure the warranty breaches. In the alternative, the proposed class representative and class members as indirect purchasers, were not required to issue notice of the warranty breach to the defendants and the lack of notice of warranty breach did not result in any prejudice to the defendants.

125. Wherefore, the proposed class representative and proposed class members demand judgment against defendants for multiple damages, interest, costs and attorneysø fees.


**COUNT II**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

37

(On Behalf of the Nationwide Class or, Alternatively, the Florida Subclass)

126.  Proposed class representative Ballou and proposed class members incorporate by reference all allegations in the above preceding paragraphs as if set forth fully in this count.

127. The defendants are merchants with respect to passenger motor vehicles.  Class vehicles are goods within the meaning of the Uniform Commercial Code as adopted by Florida and all other adopting states.

128. The defendants failed to provide legally binding written notice to the proposed class representative and other class vehicle purchasers of implied warranty exclusions at time of purchase because the warranty exclusion failed to mention merchantability and was not conspicuous within the meaning of § 2-316 and was therefore ineffective as a matter of law.

129. The defendants impliedly warranted to the general public, owners and lessees of class vehicles that the class vehicles were merchantable and fit for the ordinary purposes for which passenger vehicles are used.  The proposed class representative and proposed class members purchased their respective vehicles for personal, family, and/or household use and did not engage in commercial use of their vehicles.

130. As manufacturers of consumer goods, the defendants are precluded from excluding or modifying an implied warranty of merchantability or limiting consumer remedies for breach of implied warranty.

131. To the extent privity of contract is required for purposes of the application of implied warranty, the proposed class representative and proposed class members are third-party beneficiaries to a contract implemented by the defendants that creates an implied warranty of merchantability.

132. The defendants breached their implied warranties in that class vehicles were defective with respect to engine design and manufacture as described in this complaint and were unfit for the ordinary purposes for which passenger vehicles are used because of those defects that caused premature primary chain assembly failure and consequent engine damage.

133. Class vehicles are predisposed to premature failure in normal anticipated operating environments because of engine materials, workmanship and manufacture defects described in this complaint that existed at the time these vehicles were manufactured.

134. Class vehicles are not reliable and owners of these vehicles have lost confidence in the ability of class vehicles to perform the function of safe reliable transportation without the likelihood of unanticipated sudden catastrophic engine failure. The defendants are estopped by their conduct, as described in this complaint, from disclaiming any and all implied warranties with respect to the chain assemblies in class engines.

135. The proposed class representative and proposed class members relied on implied warranties of merchantability made by the defendants regarding class vehicles in choosing to purchase their respective class vehicles and sustained an ascertainable financial injury resulting from the breach of those warranties by the defendants.

136. The defendants received adequate notice of their breach of the implied warranty of merchantability through the proposed class representative and proposed class members' requests for repair or replacement. In the alternative, class vehicle owners, as indirect purchasers, were not required to issue notice of the warranty breach to the defendants and any lack of notice of warranty breach did not result in any prejudice to the defendants. The defendants declined to offer the proposed class representative an effective remedy for her defective class engine or vehicle.

137. Even though the proposed class representative and proposed class members complied with class vehicle engine maintenance recommendations for their respective class vehicles, their respective class vehicle engines prematurely failed because of defects in the primary chain assemblies.

138. The proposed class representative and proposed class members reasonably relied upon the expertise, skill, judgment and knowledge of the defendants and upon their implied warranty that class vehicles were of merchantable quality and fit for their intended use.  Class vehicles did not conform to the defendants' implied representations or warranties because defects in the chain assembly caused class engines to be less reliable and more expensive to maintain than competitor vehicles.

139. The proposed class representative and proposed class members had an independent legitimate consumer expectation that the class vehicles would last well in excess of 10 years and 150,000 miles before requiring any major engine repairs based on industry standards, the defendants' publications, other automotive publications, competitor products, consumer product magazines, prior vehicle ownership and reputation of the defendants for manufacturing durable quality vehicles.  There were no statements made by the defendants or their agents that contradicted or caused consumers to lower their legitimate expectations at the time of class vehicle purchase.

140. The proposed class representative and proposed class members could not have reasonably discovered the defective condition of the class vehicles because the class engine defects were hidden inside of the engine.  The defendants' breach of their implied warranties of merchantability was the direct and proximate cause of the proposed class representative's and proposed class members' financial harm.  Had class vehicles not contained defective and failing

chain assemblies, the proposed class representative and proposed class members would not have incurred the costs of engine repair.

141. Wherefore, the proposed class representative and proposed class members demand judgment against defendants including multiple damages, interest, costs and attorneys' fees.

**COUNT III**
**VIOLATION OF MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2310(d)(1(A)**
(On Behalf of the Nationwide Class or, Alternatively, the Florida Subclass)

142. Proposed class representative Ballou and proposed class members incorporate by reference all allegations in the above preceding paragraphs as if set forth fully in this count.

143. This claim is brought as a state law claim under 15 U.S.C. § 2310(d)(1)(A) and is before this Court as a supplemental state court claim for each of the state subclasses pursuant to diversity jurisdiction under CAFA.

144. The proposed class representative and proposed class members are consumers within the context of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

145. Class vehicles are consumer products within the context of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

146. The defendants are suppliers and/or warrantors within the context of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301(4)-(5).

147. The defendants' express warranties are written warranties within the context of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). Class vehicle implied warranties created by operation of state law are incorporated into the Magnuson-Moss Warranty Act as modified by § 2308.

148. The defendants breached the express and implied warranties accompanying class vehicles as described in this complaint.

41

149. The Magnuson-Moss Warranty Act provides a claim for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

150. The defendantsø breach of their express and implied warranties was the direct and proximate cause of the proposed class representative and proposed class membersø financial harm as more fully set out in the preceding warranty counts, and constitutes a violation of the Magnuson-Moss Warranty Act.

151. The proposed class representative and proposed class members alleged in this complaint sufficient direct dealings with the defendants or their agents (dealerships and technical support) to establish privity of contract with the defendants. In the alternative, privity of contract is not required because the proposed class representative and proposed class members are intended third-party beneficiaries of contracts between the defendants and its dealers, specifically including implied warranties. Authorized class vehicle dealers were not intended to be the ultimate consumers of class vehicles and have no rights under the warranty provisions accompanying class vehicles since these provisions were drafted and intended to benefit the consumer purchasers of class vehicles.

152. Affording the defendants a reasonable opportunity to cure their breach of written warranties for class vehicles would be unnecessary and futile. The proposed class representative and proposed class members have already attempted to secure coverage for their primary chain assemblies and related repairs without success.

153. At the time of sale or lease of each class vehicle, the defendants knew, should have known, or were reckless in not knowing of their misrepresentations and omissions concerning the class vehiclesø inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defects as described in this complaint. Under the circumstances, the remedies

available under any informal settlement procedure would be inadequate and any requirement that class vehicles resort to an informal dispute resolution procedure and/or afford the defendants a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

154. The proposed class representative and proposed class members would suffer economic hardship if they returned their class vehicles but did not receive the return of all payments made by them.

155. Wherefore, the proposed class representative and proposed class members demand judgment against the defendants including multiple monetary damages, interest, costs and attorney's fees.

**COUNT IV**
**VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**("FDUTPA") FLA. STAT. §§ 501.201 *ET SEQ.***
(On Behalf of Plaintiff Ballou and the Florida Subclass)

156. Proposed class representative Ballou and proposed Florida subclass members incorporate by reference all allegations in the above preceding paragraphs as if set forth fully in this count.

157. Proposed class representative Ballou brings this claim on behalf of herself and members of the Florida subclass.

158. The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices" and "unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204.

159. Proposed class representative Ballou and members of the Florida subclass are "consumers" and "interested parties or persons" under the FDUTPA. Fla. Stat. § 501.203(6) and (7).

43

160. Defendants are engaged in the conduct of "trade or commerce" as defined by the FDUTPA. Fla. Stat. § 501.203(8).

161. One of the primary purposes of the FDUTPA is to "protect the consuming public" from "those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

162. Defendants committed unfair or deceptive acts or practices, affirmative misrepresentations, material omissions and/or otherwise violated the FDUTPA. Defendants intentionally and knowingly misrepresented the standard, quality or grade of the class vehicles and intentionally and knowingly failed to disclose and concealed class engine primary chain assembly defects. Defendants' misrepresentations of the standard, quality or grade of class vehicles and failure to disclose the chain assembly defects constitute unfair acts or practices in violation of the FDUTPA because these acts offend public policy, are immoral, unethical, oppressive, or unscrupulous and/or cause substantial injury to consumers.

163. Defendants knew or should have known that the class vehicles were defective at the time of sale or lease and that the class engine chain assembly would fail before the useful life of the engine. Given the latent nature of the defect, defendants knew, or should have known, that the majority of chain assembly failures would occur outside of the coverage periods of the manufacturer's warranties.

164. Defendants knew, or should have known, that the chain assembly defects in the class vehicles could cause catastrophic engine failure leading to a loss of engine power while the vehicle was operating. Further, defendants knew, or should have known, that such loss of power could cause the class vehicles to become involved in rear-end collisions or other accidents, putting vehicle operators, passengers, and other motorists at risk for injury.

165.  Defendants owed a duty to disclose chain assembly defects and its corresponding safety risk to proposed class representative Ballou and members of the Florida subclass because the defendants possessed superior and exclusive knowledge regarding the defects and the risks associated with the chain assembly failure.  Rather than disclose the defect, defendants engaged in deceptive trade practices in order to sell additional class vehicles and wrongfully transfer the cost of repair or replacement of engine chain assembly to proposed class representative Ballou and members of the Florida subclass.

166.  Defendants have knowingly and willfully engaged in the unfair and deceptive trade practices.  Further, defendants unconscionably marketed class vehicles to uninformed consumers in order to maximize profits by selling additional class vehicles containing the undisclosed latent defect and corresponding safety risk.

167.  Defendantsø unfair or deceptive acts or practices, affirmative misrepresentations and/or material omissions regarding the chain assembly defects were likely to mislead a reasonable consumer and misled proposed class representative Ballou and members of the Florida subclass.  When proposed class representative Ballou and members of the Florida subclass purchased or leased their class vehicles, they reasonably relied on the reasonable expectation that the class vehiclesø engine chain assemblies would last beyond the warranty periods without need for repair or replacement and would not pose an unavoidable safety risk.

168.  Had defendants disclosed that class engine chain assemblies were prone to premature failure and/or an unavoidable safety risk, proposed class representative Ballou and members of the Florida subclass would not have purchased or leased the class vehicles, or would have paid less for their respective vehicles.  Further, had defendants disclosed that the chain assemblies in class engines would not last beyond the warranty periods without need for repair or

replacement, proposed class representative Ballou and members of the Florida subclass would have demanded repair or replacement during the warranty periods at no cost – as provided for in defendants' warranties.

169. Defendants' unfair and/or deceptive acts or practices, affirmative misrepresentations and/or material omissions regarding the chain assembly defects and corresponding safety risk are substantially injurious to consumers. As a direct and proximate result of defendants knowing, intentional concealment of the chain assembly defects in violation of the FDUTPA, proposed class representative Ballou and members of the Florida subclass have suffered harm and/or continue to suffer harm by the threat of sudden and unexpected failure of class engine chain assemblies and/or actual damages in the amount of the cost to replace the chain assemblies, essential engine parts or the entire engine, and damages to be determined at trial. Proposed class representative Ballou and members of the Florida subclass have also suffered the ascertainable loss of the diminished value of their vehicles.

170. As a result of defendants' FDUTPA violation, proposed class representative Ballou and members of the Florida subclass are entitled to, inter alia, injunctive and declaratory relief, actual damages, costs and attorneys' fees. *See* Fla. Stat. § 501.211.

**COUNT V**
**NEGLIGENT MISREPRESENTATION**
(On Behalf of the Nationwide Class or, Alternatively, the Florida Subclass)

171. Proposed class representative Ballou and proposed class members incorporate by reference all allegations in the above preceding paragraphs as if set forth fully in this count.

172. The defendants negligently and recklessly misrepresented to proposed class representative Ballou and proposed class members the characteristics of class vehicles with respect to engine materials, workmanship, design and manufacture, including that the class

engine had a sufficient and adequate primary chain assembly. The defendants negligently and recklessly misrepresented information in class vehicles Owner's Manual and Service and Warranty Information pamphlet that incorporated incorrect maintenance and service recommendations.

173. Proposed class representative Ballou and proposed class members reasonably and justifiably relied upon representations made by the defendants including information in the class vehicle Owner's Manual and Service and Warranty Information pamphlet that incorporated incorrect engine inspection and service intervals together with affirmations that the primary chain in class engines was lifetime.

174. As a proximate and direct result of proposed class representative Ballou and proposed class members' reliance on the defendants' negligent and reckless misrepresentations, proposed class representative Ballou and proposed class members sustained monetary damages as described in this complaint.

175. Wherefore, proposed class representative Ballou and proposed class members demand judgment against defendants for multiple damages, interest, costs and attorneys' fees.

### COUNT VI
### UNJUST ENRICHMENT
(On Behalf of the Nationwide Class or, Alternatively, the Florida Subclass)

176. Proposed class representative Ballou and proposed class members incorporate by reference all allegations in the above preceding paragraphs as if set forth fully in this count.

177. The warranty had value, which plaintiffs paid, and for which defendants agreed to render services of repair and replace.

178. The defendants breached their implied and express warranties in that class vehicles were defective with respect to engine materials, workmanship and manufacture. The defendants

47

further breached their express and implied warranties in that class vehicles were accompanied by an Owner's Manual and Service and Warranty Information pamphlet that incorporated incorrect inspection and service intervals.  The class vehicles were not of merchantable quality and were unfit for the ordinary purposes for which passenger vehicles are used because of engine materials, workmanship and manufacture defects and an Owner's Manual and Service and Warranty Information pamphlet that incorrectly set forth service intervals.

179.  The defendants intentionally, negligently and recklessly and/or fraudulently misrepresented to proposed class representative Ballou and proposed class members the characteristics of class vehicles with respect to engine design materials and/or manufacture together with information in the class vehicles' Owner's Manual and Service and Warranty Information pamphlet that incorporated incorrect engine inspection and service intervals.

180.  The defendants benefited financially from their breaches of warranty, misrepresentations and fraud as described in this complaint.  The defendants denied legitimate class vehicle engine warranty claims and obtained further unwarranted financial gain.

181.  Proposed class representative Ballou and proposed class members sustained monetary damages as described in this complaint.

182.  Allowing the defendants to retain their monetary enrichment from their wrongful and unlawful acts would be unjust and inequitable.

183.  Proposed class representative Ballou and proposed class members request that the defendants disgorge their profits from their wrongful and unlawful conduct and that the Court establish a constructive trust funded by the benefits conferred upon the defendants as a result of their wrongful conduct.  Proposed class representative Ballou and proposed class members

should be designated beneficiaries of the trust and obtain restitution for their out of pocket expenses caused by the defendants' conduct.

184. Wherefore, proposed class representative Ballou and proposed class members demand judgment against defendants for multiple damages, interest, costs and attorneys' fees.

## RELIEF DEMANDED

Wherefore, proposed class representative Ballou requests:

(a) A proposed Order pursuant to Fed. R. Civ. P. 23(c) certifying the class and/or subclass as defined in ¶ 18 with such modifications, if any, to the proposed certification as required by the Court for the efficient and equitable administration of justice in this proceeding;

(b) An Order appointing proposed class representative Ballou as representative of the proposed class and designating the law firms of Kantrowitz, Goldhamer & Graifman, P.C., and Thomas P. Sobran P.C. as counsel for the proposed class pursuant to Fed. R. Civ. P. 23(g);

(c) Judgment for proposed class representative Ballou and proposed class members against the defendants on all issues and counts;

(d) Actual, compensatory and statutory damages for proposed class representative Ballou and proposed class members, including but not limited to multiple damages, together with interest, prejudgment interest, costs and attorneys' fees;

(e) Restitution for all engine repairs incurred by proposed class representative Ballou and proposed class members resulting from the defectively designed and manufactured class engine primary chain assembly and incorrect maintenance and service intervals as set forth in the class vehicles' Owner's Manual and Service and Warranty Information pamphlet;

(f) Restitution of incidental expenses incurred by proposed class representative Ballou and proposed class members, including but not limited to rental vehicles and other substitute transportation;

(g) A court issued declaratory judgment declaring that all class vehicle class engine claims caused by defective chain assemblies are within the scope of the class vehicles' warranty coverage; and,

(h) Any other relief deemed necessary by this Court.

## REQUEST FOR JURY TRIAL

Proposed class representative Ballou and proposed class members request trial by jury on all issues and counts.

*/s/ Gary S. Graifman*
Gary S. Graifman, Esq.
Jay I. Brody, Esq.
**KANTROWITZ, GOLDHAMER
& GRAIFMAN, P.C.**
210 Summit Avenue
Montvale, NJ 07645
Tel: (201) 391-7000

*/s/ Thomas P. Sobran*
Thomas P. Sobran, Esq.
**THOMAS P. SOBRAN, P.C.**
7 Evergreen Lane
Hingham, MA 02043
(781) 741-6075
(to be admitted *pro hoc vice*)

**Attorneys for Plaintiffs**

Dated: July 18, 2018